Case No. 14-mj-4318-DHH
Case No. 14-mj-4319-DHH
Case No. 14-mj-4320-DHH
Case No. 14-mj-4321-DHH

## AFFIDAVIT OF SPECIAL AGENT JOHN VAN KLEEFF

I, John F. Van Kleeff, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since 1991.  Since in or about 2001, I have been assigned to a Counter Terrorism Squad and the Joint Terrorism Task Force ("JTTF") in the FBI's Boston Field Office and, since 2003, to the same duties in the FBI's Worcester Resident Agency.  From early 1996 to 2001, I was assigned to the Drug Squad of the Boston Field Office.  Prior to being assigned to the Drug Squad, I was assigned to an Economic Crimes Squad.  During my employment at the FBI, I have investigated federal criminal violations related to international and domestic terrorism as well as drug offenses, firearms offenses, violent crimes, computer crimes, money laundering, fraud and economic/white collar crimes, among others.  In my capacity as a special agent, I have received training and gained experience in search and seizure, the use of confidential human sources, electronic and video surveillance and other facets of investigation.  I have executed numerous affidavits in support of federal search warrants and criminal complaints and have participated in the execution of more than one hundred search warrants.

2.      The FBI has been investigating, *inter alia*, possible violations of 18 U.S.C. § 894 (Collection of Extensions of Credit by Extortionate Means, and Conspiracy to Collect Extensions of Credit by Extortionate Means) based on a series of events that began in or around December 2012 and continued until in or around January 2014.

3.     I submit this Affidavit in support of the issuance of an arrest warrant for, and a criminal complaint against, Baljit Singh Rehal a/k/a "Joel" ("REHAL" or "Joel") and Nicholas Valorie III ("VALORIE"), charging each of them with one count Collection of Extensions of Credit by Extortionate Means, and Conspiracy to Collect Extensions of Credit by Extortionate Means, in violation of Title 18, United States Code, Section 894 (the "Subject Offense").  As described below, there is probable cause to believe that from on or about December 21, 2012 to at least December 27, 2013, REHAL and VALORIE committed the Subject Offense.

4.     I also submit this Affidavit in support of an application for a warrant to search the residence of REHAL, located at 3 Green Street, Medway, Massachusetts ("REHAL's Residence"), and the residence of VALORIE, located at 26 Metcalf Avenue, Milford, Massachusetts ("VALORIE's Residence") (together, the "Subject Premises"), as described below.  As described herein, there is probable cause to believe the Subject Premises contain, and the items to be seized constitute, evidence of a crime; contraband, fruits of crime, or other items illegally possessed; and property designed for use, intended for use, or used in committing a crime, namely the Subject Offense.  A specific list of items to be seized may be found in Schedule A, and the methods by which cellphones, smartphones, and electronic devices will be searched are more fully set forth in the "Search of Smartphones" section of this Affidavit.

5.     I also submit this Affidavit in support of an application for a warrant to search an Apple iPhone that was seized during the execution of a state search warrant on April 24, 2014 in an unrelated investigation, further identified with IMSI # 310410644573297 and IMEI # 013882000199485 (the "TOCCHI Smartphone") that is presently in law enforcement possession. A specific list of items to be seized may be found in Schedule B, and the methods by which cellphones, smartphones, and electronic devices will be searched are more fully set forth in the

"Search of Smartphones" section of this Affidavit.  In addition, I also seek an order, pursuant to the All Writs Act, 28 U.S.C. § 1651, requiring Apple, Inc. ("Apple") to assist in the execution of a federal search warrant by bypassing the lock screen of the TOCCHI Smartphone,.   As detailed below, I have probable cause to believe that TOCCHI used the TOCCHI Smartphone in connection with the Subject Offense as detailed in the criminal complaints being sought against REHAL and VALORIE (that it is an instrument of that crime), and probable cause to believe that there will be additional evidence of the Subject Offense on the TOCCHI Smartphone.

6.     The facts in this Affidavit come from my personal observations, witness interviews, my training and experience, and information obtained from other agents, law enforcement officers and witnesses.  This Affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.  Statements of individuals that I describe herein are set forth in substance or in part unless I otherwise specifically indicate.

**THE SUBJECT PREMISES**

7.     The "REHAL Residence" is a single-family residence located at 3 Green Street, Medway, Massachusetts.  It is more specifically described in Schedule C, which also contains a photograph of the residence.  A white Cadillac STS registered to REHAL was parked in the driveway throughout the day on Saturday, October 4, 2014.

8.     The "VALORIE Residence" is a single-family residence located at 26 Metcalf Avenue, Milford, Massachusetts.  It is more specifically described in Schedule C, which also contains a photograph of the residence.  A red, four door Ford F150, registered to Franklin Financial, Inc., the company VALORIE owns, was parked in the driveway at approximately 8:30 a.m. on Saturday, October 4, 2014.

3

## RELEVANT STATUTES

9.      Generally, Title 18, United States Code, Section 894, makes it illegal for any person to "knowingly participate[] in any way, or conspire[] to do so, in the use of any extortionate means (1) to collect or attempt to collect any extension of credit, or (2) to punish any person for the nonrepayment thereof."  Title 18, United States Code, Section 891(1) provides "To extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred."  Title 18, United States Code, Section 891(7) defines "extortionate means" as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person."

## PROBABLE CAUSE

A.      Background of the Investigation

10.      This investigation began in December 2013 after a confidential source ("CS"), whose identity is known to me, reported that he was a victim of an extortion scheme that had been ongoing for approximately one year.  According to the CS, REHAL and VALORIE were involved in the scheme, although each's precise role was unclear at the time to the CS.  The CS later provided information regarding the involvement of an individual identified only as "CJ," and the involvement of another individual, Robert Tocchi ("TOCCHI"), whose precise role is unclear.

11.      After reporting the scheme, at the direction of the FBI, the CS made consensually recorded telephone calls with REHAL and VALORIE and the CS had at least one consensually recorded meeting with REHAL.  The CS's father also had at least one consensually recorded

4

telephone call with REHAL and at least two consensually recorded telephone calls with VALORIE. In addition, the CS has produced various documents detailing the payments that he made, including without limitation copies of emails and text messages between him and REHAL, text messages between him and VALORIE, and banking records of the CS and the CS's parents. The CS informed the FBI that between on or about January 4, 2013 to on or about December 27, 2013, he paid approximately $145,000 as part of the extortion scheme.

12.     As detailed further below, the scheme involved (1) other individuals, including without limitation REHAL, VALORIE, and "CJ," telling the CS that he owed approximately $35,000 to unknown individuals, although the CS did not believe he owed anyone any money; (2) threats to cause harm to the CS and his family if he did not pay; (3) REHAL and/or VALORIE telling the CS that two "federal agents" named "Marcus" and "David" were investigating them and the CS relating to whistleblower allegations purportedly made by TOCCHI relating to a sports betting operation; (4) REHAL and/or VALORIE collecting payments from the CS and purportedly giving those payments to "Marcus" and/or "David"; (5) REHAL and/or VALORIE telling the CS that the "agents" were close to closing their investigation and that the CS would be meeting with "Judge Wolf" in Boston to "close" his case and get a refund of the majority of the money he continued to pay to them; and (6) REHAL and/or VALORIE purportedly "loaning" money to the CS to make payments on the CS's behalf to "Marcus" and "David," having the CS sign promissory notes in favor of REHAL and VALORIE, and collecting or attempting to collect on those notes.

13.     The CS reported that, during college, he was involved as a bettor in a sports-betting operation, and that after college, he was an "agent" in a sports-betting operation that he took over, during the college basketball season of 2010, from another individual. As an "agent,"

the CS's role was to take in the bets from bettors, and either pay out winnings or collect losses. The CS stated that the operation took in approximately $3,000 to $5,000 per week.  The CS stated he made approximately $50,000 to $60,000 from the operation, but also stated he himself continued to bet during this time and could not recall how much, if any, he netted when factoring in his own betting losses.  According to the CS, he took in bets from a small group of people, mostly friends, and TOCCHI functioned as "the bank."  The CS further stated that VALORIE was partners with TOCCHI and functioned as "the bank" for other "agents."  The CS stated that by February of 2012, he stopped his participation in the sports betting operation, and did not owe money to anyone.

14.    In or around January of 2011, the CS obtained a mortgage for the purchase of a house through VALORIE, and as part of the approval process, the CS's father co-signed the loan documentation, and both the CS and his father had to provide certain financial information to VALORIE, including without limitation assets owned by each.  One specific item provided to VALORIE was information pertaining to the CS's 401(k) account valued at approximately $29,784.59 as of January 6, 2011, and another account valued at approximately $30,000.

15.    In October or November of 2012, TOCCHI told the CS he received several telephone calls from individuals who told TOCCHI he owed money. TOCCHI further detailed to the CS a meeting he claimed he had with two men, and told the CS he paid them $25,000. TOCCHI told the CS that the two men were federal agents, and stated that after he made the $25,000 payment, he was "left alone."

B.    Extortion Scheme involving the CS

16.    The CS reported that the extortion scheme began on December 21, 2012 when he received a missed call indication on his cell phone from a number he did not recognize (774-272-

6

3918)[1], followed by a text message from the same number which instructed "[CS], call me."  The CS called the telephone number, which had a country music ringback, and spoke to a male whose voice he did not recognize.  In substance, the male told the CS that he owed $36,000 and stated that "we" would be by the following day.  When the CS tried to explain that he did not owe anyone money, and did not have $36,000, the male persisted in his claim that the CS owed the money, telling the CS that they knew everything about his life and warning him not to "fuck with us."  According to the CS, no one appeared the following day.

17.     An analysis of applicable toll records establish a connection between the text message and telephone call described in Paragraph 16 and REHAL, VALORIE, TOCCHI, and other individuals as described below.  For instance:

   a.     Toll records for 774-272-3918 ("Bennett's phone") confirm that a telephone call was placed to the CS's phone at approximately 6:26 p.m. on December 21, 2012.  Consensual data extractions from the CS's phone confirm he received a text message at approximately 6:29 p.m. instructing "[CS], call me."  Toll records for "Bennett's phone" and the CS's phone also confirm that the CS called "Bennett's phone" at 6:29 p.m. on December 21, 2012.

   b.     Toll records for "Bennett's phone" indicate that it had only 5 telephone calls on December 21, 2012, two of which were with the CS and two were

---

[1]  This number is subscribed to Donald Bennett, but believed to be used by Michelle Bennett ("Bennett").  Bennett is the fiancée of Ted Strzelecki ("Strzelecki"), according to each's Facebook pages.  According to the CS, Strzelecki is a friend of REHAL's.  Records subpoenaed from Sprint indicate that Strzelecki subscribes to telephone number 508-371-0615 ("Strzelecki's phone"), using his home address in Millbury, MA for billing.

with telephone number 774-287-8646, a telephone number subscribed to by REHAL, using his home address in Medway, MA for billing ("REHAL's phone").[2]  "Bennett's phone" called "REHAL's phone" at 5:52 p.m., and "REHAL's phone" called "Bennett's phone" at 5:58 p.m. with that call lasting approximately 13 minutes.  Approximately one minute later, "REHAL's phone" called "Strzelecki's phone," which lasted for approximately 6 minutes.  Approximately 8 minutes later, "Bennett's phone" contacted the CS by phone and then text.  In addition to the above-noted telephone contacts between "Bennett's phone" and "REHAL's phone," the two phones exchanged 9 text messages on December 21, 2012 between 6:34 p.m. and 6:39 p.m, all after the CS called "Bennett's phone" and spoke with the unidentified male.

c.     On December 21, 2012, "Strzelecki's phone" and "REHAL's phone" were in contact 10 times between 3:08 p.m. and 6:25 p.m., using both text message (7 texts) and phone calls (3 calls).[3]  In addition, "Strzelecki's phone" sent two text messages to "REHAL's phone" at 6:24 p.m. – two minutes before the call to the CS's phone from "Bennett's phone."

---

[2]   Between November 20, 2012 and December 31, 2012, "Bennett's phone" and "REHAL's phone" were in contact 79 times, 35 of which were from "Bennett's phone" to "REHAL's phone" and 44 of which were from "REHAL's phone" to "Bennett's phone."  Of the 79 contacts, 20 were telephone calls, 1 went directly to voicemail, and 58 were text messages.

[3]   According to subpoenaed telephone records, between November 15, 2012 and March 26, 2014, "Strezlecki's phone" was in contact with REHAL 1423 times, which included 1190  texts, 201 phone calls, and 32 calls forwarded to voicemail.

8

"REHAL's phone" sent a text message to "Strzelecki's phone" at 6:25 p.m.

    d.    According to subpoenaed telephone records, between approximately 3:20 a.m. and 10:33 p.m. on December 21, 2012, "REHAL's phone" was in contact with 508-400-9236, a phone subscribed to by Franklin Mortgage Funding Inc., VALORIE's company, and the number that the CS identified as being VALORIE's ("VALORIE's phone").  Eight contacts were via text message and 7 were phone calls.

    e.    According to subpoenaed telephone records, "REHAL's phone" contacted 508-918-0433, a telephone subscribed to by TOCCHI ("TOCCHI's phone"), 4 times on December 21, 2012, two of which were text messages (at 10:41 a.m. and 10:42 a.m.) and two of which were phone calls (at 11:29 a.m. and 12:56 p.m. which connected for short durations).  The investigation determined that "TOCCHI's phone"[4] was a number subscribed to by Robert Tocchi, 13 Broad Street, Milford, Massachusetts 01757.  The number has been active since October 2, 2009 and has an email address of r_tocchi@hotmail.com and a home phone of 508-473-0915.

---

[4]  To clarify, "TOCCHI's phone" refers to telephone number 508-918-0433.  "TOCCHI's Smartphone" refers to the device that was seized on April 24, 2014 from TOCCHI's residence, which at the time of seizure was using telephone number 508-918-0433.  As individuals frequently change cellphones and devices while keeping the same telephone number, this Affidavit intentionally refers separately to the telephone number (TOCCHI's phone) and the device to be searched (TOCCHI's Smartphone).

18.    After speaking with the male caller on December 21, 2012, the CS called TOCCHI and described the call.  TOCCHI told the CS that the calls TOCCHI received also had a country music ringback.  TOCCHI advised the CS to obtain a "burner phone" – a pre-paid cellular telephone that CS could buy off the shelf at a store and that would not have the CS's subscriber information.  The CS told the FBI that he obtained a "burner phone" – the number of which he could not recall – and provided the telephone number only to REHAL, VALORIE, TOCCHI, and another friend of his who worked for the Massachusetts State Police.

19.    The CS also spoke with VALORIE about the calls he received.  VALORIE told the CS that he (VALORIE) had also received similar calls.  VALORIE told the CS two men had come to see him also provided a description of the men that was very similar to the one TOCCHI had provided to the CS.  VALORIE told the CS that the two men were federal agents and said their names were "Marcus" and "David."  VALORIE told the CS that he eventually paid between $200,000 and $250,000 to "Marcus" and "David."  According to the subpoenaed telephone records, the CS and "VALORIE's phone" were in contact on December 22, 2012 – the day after the CS received the call from "Bennett's phone" – 6 times, 5 of which were initiated by VALORIE.

20.    According to the subpoenaed telephone records from December 21, 2012, the CS texted with "REHAL's phone" during the course of the day 8 times, and called "REHAL's phone" at approximately 8:38 p.m., a couple of hours after speaking with the male on "Bennett's phone."  The CS told the FBI that he spoke to REHAL about the telephone call he had received. The CS told the FBI that REHAL told the CS that he also received similar calls and that he paid $25,000 to "Marcus" and provided the CS with a similar description of "Marcus."  According to

the telephone records, immediately after the call with the CS, "REHAL's phone" called "VALORIE's phone."

21.     The CS stated that a few days later, he received a telephone call from the same male he spoke to on "Bennett's phone," calling from what appeared to be a different telephone number.  The CS believed that the telephone call was received on his burner phone, although he could not be sure.  The CS stated that the substance of the second telephone call was similar to the first.

22.     On December 28, 2012, the CS began receiving numerous telephone calls from telephone number 570-406-1373.  The male caller, who the CS did not believe to be the same as the male caller using "Bennett's phone," told the CS that he owed money and that the male caller was coming to collect it.  At some later point, the individual identified himself as "CJ."  At approximately 2:02 p.m. the same day, the CS received a text message from telephone number 570-406-1373 ("CJ's phone")[5] indicating that someone was on his way up to see the CS.  The CS responded that he was confused, that he did not owe anyone any money, and asked the other person to give him a call.  Between approximately 6:00 p.m. and 7:26 p.m., the following exchange took place via text message between the CS's cell phone and "CJ's phone":

CJ:     Im almost in town

CS:     Ok do u want to meet at robs?

CJ:     All i kn im comein 2 milford

CS:     Ok

CJ:     The boy jeff where he at

---

[5]  Records from Verizon Wireless indicate that CJ's phone was a pre-paid cellular telephone whose "subscriber" was listed as "PHONEINTHEBOX."

CS:     That's me

CJ:     U really think this a game bro whts up with this money im givein u a chance to do rite pplz i do not want 2 do my job 2nite

CS:     Not at all I can tell u are serious. Lets meet because I don't know what's going on
CS:     And why this is happening I would like to know

CJ:     U owe man u owe 35k u fuck up on some house shit ok u owe u kn who u owe bro u got 2 a hour 2 come up with something they dont want alive rite i told them i try in talk 2 the guy 25k when i get there or 35k on money N im drivein get it together some how

CS:     I'm sorry I don't have a dollar to my name. This is coming out of no where I don't know what to do

CJ:     Ok im on 495 bro now how much u came up with

CS:     I don't have anything. I don't know what to do

23.     Between December 28, 2012 and January 11, 2013, the CS and "CJ" continued to text and communicate by telephone.  A full transcript of the text messages exchanged between the CS and "CJ" is attached hereto as Exhibit 1.   The texts from "CJ" told the CS he owed $35,000 and threatened the CS that if the money was not paid, it would get "ugly."   The CS repeatedly stated that he did not understand what he owed the money for and said he did not have that kind of money.   The CS told "CJ" that he could come up with $10,000 and asked if that would be enough to be "left alone."   "CJ" responded "Yea u be ok I make sure tht" and the CS began making preparations to pay "CJ" $10,000.   Ultimately, the CS texted "CJ" that he could only come up with $9,000 and continued to make preparations to pay that amount.

24.     On January 4, 2013, "CJ" asked the CS if he knew a "Knick" [sic].   The CS responded that he did not know anyone by that name.   Approximately 25 minutes later, the CS received a forwarded text message from "CJ" indicating "VALORIE."   The CS responded that

12

he knew Nick VALORIE and CJ instructed the CS to give the money to VALORIE.   Later that evening, in REHAL's presence, the CS gave $9,000 in cash to VALORIE at VALORIE'S residence as instructed to do by "CJ."   The CS took a photograph of the money while at VALORIE's house and later provided the photograph to the FBI.   VALORIE subsequently told the CS that he (VALORIE) met a "large black man" at the Stop and Shop parking lot in Milford, MA and gave the money to him.   On January 5, 2013, REHAL made a cash deposit of $4,439 into his personal checking account at TD Bank ending in -7220 (the "7220 Account").[6]

25.     On January 5, 2013, "CJ" texted the CS and told him that his "boss" was unhappy that the CS had only paid $9,000.  "CJ" forwarded the following 6 text messages to the CS:[7]

FWD: (1/6) Ay listen kid - we tried helping you. We tried being nice and respectful.  We honestly bent backwards for you but you want to play these fucking games kid

FWD: (2/6)  ? You think we're some chumps ? We made a deal to wash your debt for 10k - you insult us by coming with only 9k n short change us 1k when your total debt

FWD: (3/6)  including the late charge equals 35k ? Listen Jeff my partner and boss is done helping you out you owe us 26k - talk to whoever you need to talk to and r

FWD: (4/6) esolve this debt if this nut is not paid by Friday we will tack on another 5k per week. Crack whatever 401k you own before we come crack your soft pudgy h

FWD: (5/6) ead. We're professionals and know everything there is to know about you and your connections - do not and I fucking repeat DO NOT FUCK WITH US AGAIN JEFF.

---

[6]   VALORIE appears to bank at Milford National Bank and Trust, a local bank located in Milford, Massachusetts.  I have not yet subpoenaed VALORIE's banking records because I was concerned that VALORIE may have learned about the existence of a subpoena for his records.  Once an arrest is made, I plan to subpoena VALORIE's banking records.

[7]   The entry "FWD" at the beginning of the text message indicates it was a forwarded text message.

FWD: (6/6) ....you are nothing but a job to us buddy

26.     An analysis of the toll records for "CJ's phone" and "REHAL's phone" indicate that on January 5, 2013 at 3:38 p.m., "REHAL's phone" sent 6 text messages to "CJ's phone." Extraction data from the CS's telephone indicates that between two and six minutes after "REHAL's phone" sent 6 text messages to "CJ's phone," the above 6 text messages were forwarded to the CS by "CJ's phone."

27.     Toll records analysis shows that "REHAL's phone" and "CJ's phone" continued to be in contact after "CJ" forwarded the text messages to the CS.  At 4:13 p.m., "REHAL's phone" sent "CJ's phone" 2 text messages, and the extraction data from the CS's phone indicated that "CJ's phone" forwarded the following 2 text messages, each in 2 parts, to the CS between three and five minutes later.

FWD: (1/2) Im going to cut through this bullshit. You owe my boss that money - you have till Friday. Go ask "friends" and acquaintances but whatever you do Jeff – do

FWD: (2/2)  not fuck this up. It'll become MUCH harder for you if you want to go down this path.

FWD: (1/2) Everyone else did whatever they had to just to get this done and over with. You think your something special that we'll just magically vanish without fini

FWD: (2/2) shing the job ?

28.     The CS responded by telling "CJ" that he would have $3,500 by Monday and stated "So 3500 Monday and we are done for real?"  "CJ" responded "Yep."

29.     Two days later, January 7, 2013, "CJ" instructed the CS to wire $3,500 to Amanda Stratford, 18634 Nanticoke, PA.  Documents from Western Union confirmed this

payment was made.  FBI has determined that Amanda Stratford of Nanticoke, PA was a real person who was murdered in September 2013 in an apparent drug rip.

30.     Additional texts from "CJ" suggested that "Rob" (TOCCHI) owed money and had somehow gotten the CS involved in the repayment.  According to the CS, he had no idea whether TOCCHI owed anyone money, but he insisted that he (the CS) never owed money to anyone.[8] The CS also told the FBI that TOCCHI denied owing anyone any money and told the CS that he (TOCCHI) did not know why "CJ" was claiming otherwise and also did not know why the CS purportedly owed money as a result.

31.     On January 9, 2013, "CJ" forwarded texts to the CS that state that the CS had paid $9,000 (although he purportedly owed $10,000), and that another $10,000 was due each of the following Fridays for two weeks.  "CJ" instructed the CS to send another payment via Western Union to "Darian Twyman pa . 18634." Western Union records confirmed that $2,000 was wired to Darian Twyman on January 10, 2013 at approximately 9:30 a.m., and texts between the CS and "CJ" indicate that the CS was at the sending location just prior to that time.

32.     FBI analysis of telephone records for January 10, 2013 indicated that "REHAL's phone" was in communication with both "CJ's phone" and "VALORIE's phone."  According to the CS, a few hours after the CS sent the payment to Twyman via Western Union, REHAL called the CS very upset, stating that "Marcus" and "David" told him (REHAL) that the CS should not have wired the money and that neither Western Union payment had been received. According to the data extraction from the CS's phone, at approximately 1:54 p.m., the CS sent a

_____

[8]  In one of his text messages to "CJ" on January 9, 2013, however, the CS stated "I had a gambling problem and stopped 6 months ago. . ." in response to "CJ's" text that suggested the CS and/or others may have made some money on a recent football game.

text message to "CJ" stating "My buddies are getting calls that your boy never got my money.  Is everything all set".  Approximately 15 minutes later, the CS texted "CJ" "I tried to cooperate but now I'm told my money didn't go to the right place" followed by another text that stated "I need the money back in an hr if it didn't go to right place".  In the last text from "CJ's phone", on January 11, 2013 at 7:55 a.m., "CJ" responds "I dare u go 2 the cops bra N u kn wht I see your fat ass 2 u really see me now pussy."

33.     Toll records analysis confirms numerous contacts, by both text message and voice calls, on January 10, 2013 between "REHAL's phone" and the CS, as well as between "REHAL's phone" and "CJ" and "REHAL's phone" and "VALORIE's phone," among others. For instance:

      a.     FBI analysis of telephone records for "CJ's phone" revealed that it had 292 contacts between January 4, 2013 and September 2, 2013 with "REHAL's phone."   Of the 292 contacts, 232 were text messages exchanged between January 4 and 16, 2013.  Another 53 of the contacts were telephone calls, 49 of which occurred between January 16 and April 4, 2013, and the remaining 7 contacts were calls that were forwarded to voicemail.  Of the 292 contacts, 128 originated from "CJ's phone" to "REHAL's phone" and 164 originated from "REHAL's phone" to "CJ's phone."

      b.     During the text messages between "CJ" and the CS, "CJ" referred to "Rob" (who the CS believed to be TOCCHI).  On January 8, 2013, the CS texted "CJ" a telephone number for TOCCHI, 508-918-0433 ("TOCCHI's phone").   An analysis of telephone records for "TOCCHI's phone"

revealed it was in contact with "CJ's phone" 44 times between January 8

and 9, 2013, all <u>after</u> the CS provided TOCCHI's number to "CJ."

34.     The CS told the FBI that he was still responsible for the money that was

purportedly mis-sent by Western Union, and that REHAL loaned him $5000 to make the

payment.  On January 11, 2013, REHAL sent the CS an email in which he indicated that he had

not yet received a telephone call or text message, but that when he did, he would drop off the

$5000 on the CS's behalf.  On January 18, 2013, REHAL sent a photograph of money –

purportedly the $5000 that REHAL had loaned to the CS to make payment to "Marcus" and

"David" – via text message to the CS.    REHAL deposited $5,000 in cash into the 7220 Account

the same day.  On or about January 18, 2013, the CS gave REHAL $21,000 in cash (which he

withdrew from his bank account) at the World's Gym parking lot in Milford, Massachusetts.

REHAL subsequently told the CS that he (REHAL) gave this $21,000 to "Marcus" and "David"

on the CS's behalf.   After the CS gave the money to REHAL, REHAL and he exchanged emails

where REHAL told the CS that "they" (meaning "Marcus" and "David") called and would meet

REHAL later that day to collect the payment.  At approximately 6:05 pm, REHAL sent the CS a

text that he was "With em now" and four minutes later sent an email to the CS telling him "Meet

me at best buy – your golden but 10k short cuz you were late.  They swore on there lives that

they'll repay the initial funds its just that they needed to renew shit."

35.     According to the CS, REHAL had told him that (1) TOCCHI had been a

whistleblower against the CS, REHAL and VALORIE for the sports-betting operation, (2)

"Marcus" and "David" were "federal agents" investigating TOCCHI's claims, (3) "Marcus" and

"David" had to pay $5,000 per month to keep an investigation going, and (4) after the

investigation was closed, the CS, REHAL and VALORIE would receive back a substantial

17

amount of the money they paid.  REHAL continued to act purportedly as the go between for the CS, on the one hand, and "Marcus" and "David," on the other hand.  REHAL told the CS that the CS could not meet "Marcus" and "David" because the CS might recognize "David," although he did not provide additional detail on why the CS would recognize him.  REHAL would tell the CS how much he owed, what the money was for, collect the money and purportedly pay "Marcus" and "David" on the CS's behalf.

36.     REHAL emailed the CS on January 20, 2013 stating "Just spoke to them – your final payment is 13700 due before Wednesday.   We get our money back 9 days from Wednesday."  On or about January 22, 2013, the CS gave REHAL $8,000 (which he withdrew from his bank account) at REHAL's gym.   REHAL deposited $7,900 in cash into the 7220 Account the same day.  The next morning, REHAL emailed the CS:

> They came to my apartment – the apartment isn't even in my fucking name.  When I asked how they knew marcus smiled and said your buddy isn't trust worthy be careful who you ask to come to your house.  You still owe the remainder and now another late fee marcus said ask nick to help you out with his connections.  But everything must be paid on time and everything will be returned on time.

37.     On or about January 24, 2013, the CS gave REHAL $6,000, which the CS believed REHAL was giving to "Marcus" and "David" on the CS's behalf.  On January 29, 2013, the CS wrote a check from his TD Bank account for $6,000 payable to REHAL.  The same day, REHAL deposited the CS's $6,000 check into the 7220 Account.

38.     From in or about January of 2013 to in or about December of 2013, the CS continued to give money to REHAL who then purportedly gave the money to "Marcus", "David" or other purported federal agents.   During this time, the CS received numerous emails from

REHAL.   Additionally, the CS signed several promissory notes in favor of REHAL and others when the CS "borrowed" money to give to REHAL with the understanding that REHAL was giving the money to "Marcus" or "David."   The CS repaid REHAL for these purported loans. The promissory notes were all drafted by VALORIE.  The monthly payments were to be made to VALORIE or another individual to whom VALORIE sold one of the promissory notes.

39.   During this time period, REHAL continued to claim to the CS that he (REHAL) was talking with "Marcus" and "David."   REHAL periodically also told the CS how much he owed.  REHAL indicated to the CS on numerous occasions that "Marcus" and "David" worked at 1 Center Plaza in Boston, which I know to be the location of the FBI office.  The CS believed that the payments he continued to make were being "applied" to this alleged investigation, and that ultimately his "case" would be "dismissed."   REHAL and/or VALORIE told the CS that (1) VALORIE would first go to Boston to meet with Judge Mark Wolf for his "closing" and would get a return of some or all of VALORIE's money, and (2) within a few days after VALORIE's "closing," REHAL and the CS would go together to meet with Judge Wolf for their "closings" and return of some or all of their money.   According to the CS, the "closing" date was continually rescheduled to a later date, purportedly because the CS had not timely paid his "balance."

40.   During this same time period, REHAL told the CS that TOCCHI, purportedly a whistleblower about the sports-betting operation, had filed "211 forms" on REHAL, VALORIE, and the CS, which REHAL indicated was a form a whistleblower could file with the IRS to report someone for under-reporting of income.   REHAL emailed the CS that "Marcus" and "David" showed him (REHAL) the forms that were filed against REHAL, VALORIE and the CS but that "they" would not let him take pictures of the forms to show the CS.  The CS conducted

some Internet research and confirmed that the IRS had a "211 form" that whistleblowers could file.

41.    Sometime in or about November of 2013, REHAL told the CS that the CS, REHAL, VALORIE, "Marcus," "David," and Judge Wolf would meet at the Federal Courthouse in Boston on November 25, 2013 and have the case dismissed.  According to REHAL, he and the CS would receive 6 months unsupervised release and VALORIE would receive supervised release.

42.    In preparation for the purported upcoming meeting with Judge Wolf, VALORIE, REHAL, and the CS met at VALORIE'S residence and REHAL provided the CS with three Massachusetts Trial Court, District Court Department, Motion to Seal Record forms which were blank except for "docket numbers" written in by hand.[9]  Although REHAL and/or VALORIE previously had told the CS that his "case" was in "federal court," the forms presented to the CS to complete were Massachusetts Trial Court forms.  REHAL and/or VALORIE told the CS that these forms had come from "Marcus" and "David."  REHAL instructed the CS how to complete the forms, including what to write on them.  REHAL and/or VALORIE told the CS that there was a $500 filing fee for each form, and instructed the CS to put $500 in envelopes and attach the envelopes to each form.  VALORIE stated to the CS that he had already completed five of these forms and attached five envelopes, each containing $500 in cash.  The CS saw envelopes attached to forms, and saw some cash, although he could not be sure how much, inside at least one of the envelopes.  The CS attached $500 in an envelope to each of his Massachusetts Trial Court forms and left them with VALORIE at VALORIE's residence.

---

[9]  The docket numbers do not appear to be valid docket numbers for any Massachusetts state court case or any federal court case.

43.     According to the CS, he eventually paid an additional $7,000 to $8,200 in additional court filing fees as he was unable to come up with the initial filing fees and the November "closing" was delayed.  The CS stated that because of the delay, he was "charged" for REHAL's and VALORIE's filing fees.

C.     Recordings of REHAL and/or VALORIE

44.     On December 19, 2013, the CS, while represented by counsel, met with the FBI to provide information about this extortion scheme.  During the meeting, the CS agreed to record telephone conversations or meetings with REHAL and/or VALORIE.

45.     At some point during December 2013, VALORIE purportedly "loaned" the CS $300 when the CS was short on one of his scheduled payments to "Marcus" and "David." VALORIE asked the CS to provide some collateral, so the CS gave VALORIE a set of between 8 and 10 coins that belonged to the CS's deceased grandfather.  According to the CS, the coins were worth less than $300.[10]

46.     During a recorded call with REHAL on December 20, 2013, the CS and REHAL discussed how the CS was being charged $300 per day by "Marcus" and "David".  REHAL told the CS that he thought "Dave" (who the CS understood to be the federal agent "David") was going to "pistol whip" the CS because the CS was continually late in making payments.  REHAL further indicated that "Dave" was "pissed off" because "he's not going to get his money back." REHAL made reference to "Dave" being a "federal officer."   REHAL further stated to the CS that VALORIE would be going to court on January 14 or 15, 2014 for his "closing" and that REHAL and the CS would be going to court approximately two to three days thereafter.  On the

---

[10]   Subsequent consensual recordings made by the CS with VALORIE discussed the coins and how the CS owed VALORIE money in order to get the coins back.

21

same day, the CS had a recorded call with VALORIE, in which VALORIE confirmed that (1) the CS needed to come up with a $300 payment, (2) VALORIE had seen the figures owed that purportedly came from "Marcus" and "David," and (3) VALORIE was planning to go to court for his "closing" on January 14, 2014 and that the CS was going right after him.

47.     On December 21, 2013, the CS texted REHAL "Please just tell them that I'm working on everything it's just the tab keeps growing" in response to REHAL's repeated attempts to collect money purportedly owed by the CS.   At approximately 1:02 a.m. on December 22, 2013, in response to the CS's text message, REHAL sent the following text message to the CS:  "I told them – they said you did it to yourself.  I have sarahs parents over and they just barged in to come talk to me  If not done by tomorrow they will hit you again for 3500 then the last they take the whole cheque and drop you"  On December 22, 2013, in a consensually-recorded telephone call between the CS and REHAL, REHAL stated that "they" (who the CS understood to be "Marcus" and "David") had shown up at REHAL's apartment the night before and had not left until approximately 1:00 a.m. on December 22, 2013, just prior to REHAL sending the above-described text message.  During the call, REHAL told the CS that REHAL was meeting with "Marcus" and "David" the following day.  That evening, REHAL texted the CS "13500K is the cap limit due on Tuesday."

48.     During a December 23, 2013 recorded call, REHAL told the CS that "they" (who the CS understood to be "Marcus" and "David") had capped the interest the CS owed and that

"they" were "going up to the highest legal limit . . . that they can actually pay without you know, considering it being illegal."[11]

49.     On December 23, 2013, at approximately 6:52 p.m., the CS recorded a telephone call with VALORIE in which the two discussed that the CS's "debt" was $13,500 and that it was "maxed" out at that number.  VALORIE asked the CS whether the CS was going to "ask your old man to be getting more money?"

50.     Just after the CS ended the call with VALORIE, the CS recorded a call with REHAL at approximately 6:58 p.m. during which the CS was instructed by law enforcement to tell REHAL that he would not be able to get the remaining money from his father until sometime during the first week of January 2014.  In response, the following conversation between REHAL and the CS took place:

> REHAL:     I have to come up with twenty five hundred dollars if it's not paid by this week.
>
> CS:            Dude, I don't know what to say.  I don't know why they are charging you for it.
>
> REHAL:     [CS] . . . Uh, kid I will break your father's fucking face.  Alright?
>
> CS:            Dude.
>
> REHAL:     I'm not coming up with twenty five hundred dollars because of your fucking bullshit.

---

[11] During this call, REHAL made statements suggesting that he and others are involved in drug trafficking.  For example, REHAL stated to the CS "The money you gave me, I bought something chopped it up and pushed it. . . . Hey, do you know anyone that wants anything right now? . . . Well when I tell you it's like, you know, jet fuel like 1980's disco shit."   When questioned, the CS stated he understood REHAL to be talking about cocaine, but denied ever dealing or selling cocaine with REHAL previously.

. . . .

REHAL:      You know what?  Tell . . . . You bring your fucking old man in front of me in the next half hour, and I'll blow it up. Cock sucker, if you don't do it I will.

. . . .

REHAL:      Guy.  Let me, again, let me say this again.  You're gunna do something, right now, to get this thing done.  Because of you, I haven't even done shit.  And you have the balls to fucking tell me to tell them that ya, you uh, you know what guys, fuck yourself, uh, I can't do anything until the first week of January.

. . . .

CS:     I can't do anything.  I can't, I can't get any money.  I don't have no money.  I've given them everything I have.  My father has tapped himself out.  I don't have anything else that I can give right now.

. . . .

REHAL:      I'll come to your fucking house and drag your fucking ass out and beat the shit out of you in front of everyone for fucking doing this to me.

At the end of the call, REHAL told the CS he (REHAL) was receiving a "restricted" call and hung up.

    51.     At approximately 7:05 p.m., the CS recorded another call with REHAL in which REHAL led the CS to believe REHAL had just spoken with "Marcus" and "David" to tell them that the CS was not going to be able to come up with the balance owed until the first week of January 2014.[12]  REHAL told the CS to come up with "at least fucking half" by the following

---

[12]   According to Sprint records, however, "REHAL's phone" twice contacted "VALORIE's phone" after the 7:05 p.m. call with the CS ended, at approximately 7:09 p.m. and 7:11 p.m., which calls lasted for over nine minutes in total.  Thereafter, at approximately 7:55 p.m., "REHAL's phone" texted the CS, and

day, and when the CS responded there was no way he could come up with $7,000 for the next

day, REHAL stated "Kid.  I will beat the fucking shit out of you in front of your fucking mother

and slap her silly if you don't.  Alright?  I'm not coming up with twenty five hundred dollars

because of your fucking bullshit."

52.     At approximately 8:28 p.m. that night, the CS recorded another call with REHAL

in which REHAL asked the CS if he lived at "62 Sunset Drive" and when the CS responded

"yes," REHAL stated he was "right outside."   REHAL tried to convince the CS to meet him

somewhere so they could go for a ride and talk, but the CS resisted.  Approximately 10 minutes

later, the CS recorded a call with VALORIE in which VALORIE told the CS that VALORIE had

just spoken to REHAL and urged the CS to meet with REHAL to try to straighten things out.

The CS then recorded another call with REHAL in which REHAL stated that he was not going

to hurt the CS but that he wanted to meet him in person that night.  When the CS questioned why

REHAL wanted to meet in person, REHAL responded that he did not want to talk over the

telephones.

53.     Eventually, REHAL convinced the CS to meet him in person.  This meeting was

not recorded as the CS had been instructed not to meet REHAL in person and recording

equipment was not available.  FBI was able to conduct limited surveillance on the meeting.

After the meeting, the CS provided a detailed description of what occurred.  According to the

CS, REHAL got out of his car and handed the CS REHAL's cell phone, wallet and keys, and

told the CS that he has to hand over these items to "Marcus" and "David" every time he meets

with them.  REHAL also lifted his shirt and told the CS that he also has to lift his shirt with

---

then exchanged text messages with "VALORIE's phone."  Over the course of the next two hours,
"REHAL's phone" and "VALORIE's phone" were in contact five times via text and two telephone calls.

"Marcus" and "David" to show that he does not have any recording equipment.  FBI surveillance

of the meeting confirmed that REHAL lifted his shirt up at the outset of the meeting.

54.     After the meeting with REHAL, the CS contacted VALORIE and recorded the

conversation.  The CS told VALORIE that he met with REHAL and that REHAL lifted up his

shirt (purportedly to show that REHAL was not wearing a recording device) and told the CS that

he (REHAL) had to do that every time he saw "Marcus" and "David."

55.     At approximately 10:24 p.m. on December 23, 2013, the CS received a text

message from REHAL:  "At least 2k is required by Friday no matter what to freeze my tab and

nicks tab.  Or else nick and I get a 2500 hit plus 300 a day for each of us per day".

56.     On December 27, 2013, the CS met with REHAL to pay him the $300 balance

owed on one of the promissory notes the CS signed in favor of REHAL.  The meeting was both

audio and video recorded with the CS's consent.  Prior to the meeting, at the direction of the FBI,

the CS told REHAL and VALORIE both that he would not have any additional money that he

purportedly owed until the week of January 6, 2014.  During the December 27, 2013 meeting

with REHAL, the CS told REHAL "I said I know the number is eighteen five and I will have it

the week of the one sixth."  REHAL tells the CS that what he is telling him is "bullshit" and tells

the CS to call VALORIE "so he's on the same fucking page."  While REHAL was still in the

CS's presence, the CS then called VALORIE to tell him that the CS would have $18,500 the

week of January 6.

57.     Through text messages and recorded telephone calls, the CS continued to

maintain to REHAL and VALORIE that he would be getting $18,500 from his father on January

9, 2014.  On January 9, 2014, at the direction of the FBI, the CS called REHAL to tell him that

his father would not give him the money.  The CS explained that his father wanted assurances

that if he paid the money, "this is ending."  Thereafter, both REHAL and then VALORIE spoke on a recorded call with the CS's father.  REHAL told the CS's father that TOCCHI was a whistleblower, that "Marcus" and "David" were "vouching" for REHAL, VALORIE, and the CS, and that after the remaining $18,500 was paid by the CS, they would go to court on January 14, 2014 to resolve their cases.  When VALORIE spoke to the CS's father, VALORIE claimed that he had "gone through the same stuff" as the CS, and also told him that the CS was supposed to get some of his money back.  REHAL got back on the call and told the CS's father that the $18,500 purportedly owed by the CS was "probation fees" and that "it all just gets reimbursed back to us because we are innocent."  REHAL told the CS's father that he met "Marcus" and "David" "several times" and claimed that the CS had spoken to them on the telephone.

58.    The following day, January 10, 2014, during a consensually recorded call, VALORIE told the CS's father that he (VALORIE) had received a telephone call and text message that "Craig," purportedly the supervisor for "Marcus" and "David," was willing to meet with the CS to provide the assurance the CS's father was seeking.  VALORIE claimed that the CS had "dragged" VALORIE "back into this stuff" after VALORIE had "paid everything I was supposed to pay."  At the direction of the FBI, the CS's father responded that he only wanted to meet with "Marcus" and "David."  No such meeting ever occurred.

59.    Thereafter, calls and texts between the CS and REHAL and/or VALORIE continued, whereby REHAL and/or VALORIE continued to try to obtain money from the CS. The CS did not pay any additional money.

D.    Probable Cause to Search TOCCHI's Smartphone

60.    On April 24, 2014, TOCCHI was arrested by the Milford, Massachusetts Police Department after receiving a controlled delivery of five pounds of suspected marijuana.  A total

of 4 cellular telephones were seized during a subsequent execution of a court ordered search warrant of TOCCHI's residence, including the TOCCHI Smartphone.

61.     After being advised of and waiving his Miranda rights, TOCCHI advised that he was an out of work carpenter and he needed money because people were shaking him down for money because they suspected he was into illegal bookmaking.  TOCCHI identified the people shaking him down as "Marcus," a Federal Marshal and "David," a Worcester Police Officer, who handcuffed him and pointed a gun at him when he met them at the Greendale Mall in Worcester, Massachusetts.   TOCCHI was told he owed $19,000 which he eventually paid. TOCCHI stated that he did not report this matter to law enforcement.   According to TOCCHI, REHAL told him that he (REHAL) did research on "David" who had been recently arrested for impersonating a police officer and that REHAL's brother was also being extorted.  When asked why he was being extorted, TOCCHI said he did not know but was aware that other people, such as REHAL, VALORIE and the CS, were also extortion victims.

62.     During this interview, TOCCHI also stated that someone again attempted to extort him several months ago stating they had pictures of his girlfriend.  The CS reported that on March 10, 2014, TOCCHI messaged the CS on Facebook and stated "they tried to come back for 38k 2 months ago let's just say someone's behind bars and there ALLOT of people pissing there pants wondering when he's gonna dime them out . . ."

63.     On May 1, 2014, FBI agents attempted to interview TOCCHI at his residence regarding TOCCHI's prior statement that he was being extorted for $19,000.  TOCCHI advised the interviewing agents he did not want to "self incriminate" himself and refused to provide consent for agents to search the Smartphone.

64.     Based on the investigation to date described above, I believe there is probable cause to believe that REHAL, VALORIE, "CJ" and TOCCHI, among others, were in contact with each other during the commission of the extortion scheme described in this Affidavit.  In addition to the information previously described, *supra*, in Paragraph 17 of this Affidavit, an FBI analysis of the "TOCCHI phone" telephone records indicate that it was in contact with "REHAL phone" 995 times between August 8, 2012 and November 22, 2013. Of the 995 contacts, 759 were text messages (August 8, 2012 through November 22, 2013) and 236 were telephone calls (August 17, 2012 through November 22, 2013).

65.     An FBI analysis of the "TOCCHI phone" telephone records indicates that the "TOCCHI phone" was in contact with the "VALORIE phone" 987 times between June 27, 2012 and December 12, 2013, with 98 of those contacts occurring between November 8 and December 12, 2013. Of those 98 contacts, 97 were text messages and one was a telephone call (on December 9, 2013).

66.     An FBI analysis of telephone records for "Bennett's phone" revealed it was in contact with "TOCCHI's phone" 18 times between December 10 and 18, 2012, 17 of which were telephone calls and 1 of which was a text message.

67.     The telephone records provide additional probable cause to believe that TOCCHI himself communicated by cell phone with REHAL, VALORIE and "CJ" in furtherance of the extortion under investigation.

68.     Based on my training and experience, I know that individuals do not always delete text messages from their cellular telephones, and that smartphones are essentially computers that often retain information for significant periods of time.

## TECHNICAL TERMS

69.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.   Cellphone:   A cellphone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals.   Cellphones send signals through networks of transmitter/receivers, enabling communication with other cellphones or traditional "land line" telephones.   A cellphone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, cellphones offer a broad range of capabilities.   These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Cellphones may also include global positioning system ("GPS") technology for determining the location of the device.

    b.   "Smartphone" used generically means a cellphone that includes additional software functions, such as an internet browser, and hardware options, such as camera.   The device at issue in this complaint has been defined herein as "the TOCCHI Smartphone" to designate the specific device.

    c.   Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen.   Tablets

function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.   Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.   Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

70.     Based on my training, experience, and research, I know that the Subject Devices have capabilities that allow them to serve as wireless phones, digital cameras, portable media players, GPS navigation devices, PDAs, and tablets.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## SEARCH PROTOCOL FOR ALL CELLPHONES, SMARTPHONES AND DEVICES SEIZED

71.     As described above, my investigation has established that REHAL, VALORIE, "CJ," TOCCHI and others used cellphones, and in particular one or more smartphones, to participate in and facilitate the Subject Offense.

72.     Based on my knowledge, training, and experience, many telephone devices can now function essentially as small computers.  These "smartphones" can be used to make and receive telephone calls, send and receive text messages, access the internet, and access email. Apple iPhones, such as the TOCCHI Smartphone, are a type of smartphone.

73.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at http://www.apple.com/iphone, I know that the Smartphone has capabilities that allow it to serve

31

as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

74.     In addition, from my training, experience, and information provided to me by other agents, I am aware that individuals involved in bookmaking and extortion activities frequently use computers and other electronic devices, including iPads and smartphones, to carry out, communicate about, and store records related thereto.

75.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files, including files on smartphones, or remnants of such files can be recovered months or even years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

a.      Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b.      Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media, in particular, computers' internal hard drives contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of

operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

76.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

77.     *Forensic evidence.*  As further described in Schedule A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device(s) was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the device(s) because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

78.  *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of all cellphones, smartphones and devices seized from the Subject Premises as well as the TOCCHI Smartphone consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose

34

many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

79.     Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a significant amount of time.  Indeed, computer specialists, using exacting data search protocols, must often recover hidden, erased, compressed, password-protected, or encrypted files in order to find evidence of criminal activity.  Moreover, many commercial computer software programs save data in unique formats that are not conducive to standard data searches.  This requires additional effort by specialists to review such data for evidence of a crime.  Finally, many users try to conceal criminal evidence by storing files in random order with deceptive file names.  This requires specialists to examine all of a user's stored data to determine which particular files are relevant and within the scope of the search warrant.  This process can take a substantial amount of time depending on the volume of data stored.

80.     Because computer evidence is extremely vulnerable to tampering or destruction, both from external sources or from destructive codes imbedded in the system as "booby traps," a controlled environment is essential to a complete and accurate analysis.

81.     For the reasons described in this Affidavit, it is necessary to seize all active and inactive cellphones, smartphones and other devices capable of sending and/or receiving text messages and/or emails, and any chargers for such devices, as described in Schedule A.  It is further necessary to search such equipment in a controlled environment, off-site.  Given the potential for large quantities of data, a complete forensic examination of the seized items will take longer than fourteen days.

82.     To the extent practical, if persons claiming an interest in the seized cellphone(s), smartphone(s), and device(s) so request, I will make available to those individuals copies of requested files (so long as those files are not considered contraband) within a reasonable time after the execution of the search warrant.  This should minimize any impact the seizures may have on personal and/or business operations.  In addition, as soon as practical, those items of hardware and software no longer required for the purpose of analysis or copying of items authorized to be seized, or for the preservation of the data and/or magnetic evidence, will be returned to the party from which they were seized, so long as such items do not constitute contraband.

## CONCLUSION

83.     Based upon the foregoing, I respectfully submit that there is probable cause to believe that REHAL and VALORIE, among others, have committed the Subject Offense.  Based upon my training and experience, I further submit that there is probable cause to believe that evidence, fruits and instrumentalities of the Subject Offense will be found on Subject Devices located at REHAL's Residence and VALORIE's Residence, as well as on the TOCCHI Smartphone.  Accordingly, I respectfully submit that there is probable cause for the issuance of a search warrant authorizing the search of the Subject Premises for and subsequent examination of items described in Schedule A, as well as the examination of the TOCCHI Smartphone as set forth in Schedule B.

Respectfully submitted,

JOHN F. VAN KLEEFF
Special Agent
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me
On October 7, 2014:

HONORABLE DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE

37

## SCHEDULE A

Items to be searched and seized from the Subject Premises:

1.  Any and all cellphones, smartphones, or electronic devices capable of sending and/or receiving SMS or text messages and/or emails and/or capable of placing and/or receiving telephone calls, including all chargers belonging to or compatible with such devices.

2.  All records or data that relate to violations of Title 18, United States Code, Section 894 (Collection of Extensions of Credit by Extortionate Means, and Conspiracy to Collect Extensions of Credit by Extortionate Means), including without limitation:

    a.  Records of extortion, extensions of credit, or collections of credit by extortionate means;

    b.  All bank records, checks, credit card bills, account information and other financial records;

    c.  Text messages, instant messages, or emails;

    d.  Contact lists;

    e.  Telephone call logs;

    f.  Evidence of user attribution showing who used or owned the cellphone,, smartphone or electronic device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

## SCHEDULE B

The property to be searched is a smartphone further described as an Apple iPhone with a black face and gray sides and back, further identified with IMSI # 310410644573297 and IMEI # 013882000199485 (the "TOCCHI Smartphone"), for the following information:

1.      All records or data that relate to violations of Title 18, United States Code, Section 894 (Collection of Extensions of Credit by Extortionate Means, and Conspiracy to Collect Extensions of Credit by Extortionate Means), including without limitation:

   a.   Records of extortion, extensions of credit, or collections of credit by extortionate means;

   b.   All bank records, checks, credit card bills, account information and other financial records;

   c.   Text messages, instant messages, or emails;

   d.   Contact lists;

   e.   Telephone call logs;

   f.   Evidence of user attribution showing who used or owned the cellphone,, smartphone or electronic device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

2

## <u>SCHEDULE C</u>

## DESCRIPTION OF THE PREMISES TO BE SEARCHED

The premises to be searched are as follows:

(1)     The "REHAL Residence" is a single-family residence located at 3 Green Street, Medway, Massachusetts.  It is further described as a yellow garrison colonial with white trim and shutters with a one car garage.  A sign reading "REHAL RESIDENCE #3" is on the front door.  It is the last house on the left of Green Street, which is a dead-end street in Medway.



3

(2)     The "VALORIE Residence" is a single-family residence located at 26 Metcalf Avenue, Milford, Massachusetts.  It is further described as a gray split-level entry residence with a red front door, black shutters, and a one car garage.

